**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Christensen Forest Products, Inc.,

Plaintiff,

v.

Potlatch Corporation,

Defendant.

Civil No. 02-753 (DWF/RLE)

**FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER FOR JUDGMENT, AND MEMORANDUM**

---

Michael T. Milligan, Esq., and Heidi N. Wolf, Esq., Quinlivan & Hughes, P.O. Box 1008, St. Cloud, MN 56302, counsel for Plaintiff.

Frank B. Yetka, Esq., Rudy Gassert Yetka & Pritchett, P.A., 123 Avenue C, Cloquet, MN 55720, counsel for Defendant.

---

The above-entitled matter came on before the undersigned United States District Judge as a Court trial on September 29 and 30, and October 6 and 7, 2003.

Based upon the presentations of counsel, including all pre-trial and post-trial submissions, and the Court having carefully reviewed the evidence in the case, including all testimony and exhibits submitted by the parties, and the Court being otherwise duly advised in the premises, the Court hereby makes the following:

## FINDINGS OF FACT

1. Approximately 20 years ago, Plaintiff, Christensen Forest Products, Inc. ("CFP") began supplying Defendant Potlatch Corporation ("Potlatch") with pre-cut lumber to use for pallets, crates, and skids. The lumber Potlatch required was unusual in size, and CFP agreed to cut and cure the lumber especially for Potlatch.

FILED JAN 21 2004
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JAN 21 2004
DEPUTY CLERK

From the beginning of the relationship between Potlatch and CFP, Potlatch established the base price it would pay for the product purchased from CFP. Thereafter, for price increases requested by CFP, Potlatch would decide whether to grant the price increase, with or without negotiations.

2. The initial agreement between CFP and Potlatch was oral, but has since been supported from time to time by written purchase orders. The verbal agreement between CFP and Potlatch was first formed between CFP founder Carl Christensen, on behalf of CFP, with Potlatch.

3. In 1986, Carl Christensen sold CFP to Ashley Oothoudt. Oothoudt incorporated CFP and sold it to Jerry Digiovanni and Richard Tabaka in 1989. CFP is presently owned by Jerry Digiovanni and Don Christensen.

4. CFP has continually done business with Potlatch since its inception and, over the course of the existence of CFP, Potlatch has been the primary customer and, at times, the only customer of CFP.

5. CFP and Potlatch contracted specifically for the sale of component products for use in the manufacturer of skids and pallets by Potlatch. Potlatch required that the lumber that it was provided be tailored to its specialized dimensions: number 3 common or better; dried to 12%; and, at times, delivered to Potlatch within 24 hours of a request. In actual practice, the finishing room of Potlatch would determine what it needed and would communicate this to CFP, but not to the Purchasing Department. Potlatch would call or fax, as late as 3:00 p.m. the day before with an order, and CFP would deliver the next day.

6. Potlatch issued one purchase order for the Brainerd plant in 1986. With respect to the Cloquet plant, Potlatch would issue purchase orders from time to time, up until 1986, and subsequent to 1986. Purchase orders were substantially consistent with one another.

7. However, the Court finds and concludes that CFP and Potlatch utilized the purchase orders for billing purposes and record-keeping purposes, and, at times, to confirm an oral agreement or modification of the verbal understanding, such as a change in price or a change of size in product. When the relationship between CFP and Potlatch and the custom and practice between them is closely scrutinized, the evidence establishes that the purchase orders were either ignored or not relied upon in virtually all respects by the parties.

8. In 1987, Potlatch stopped using 7/8" board and began using 5/4" board at the Cloquet plant. Potlatch purchased all of CFP's 7/8" inventory, both finished and rough-cut lumber. The Court finds that this custom and practice of Potlatch utilizing all of CFP's 7/8" inventory was consistent with the agreement that the parties had that CFP would "provide continuity of supply" at all times. Such language is found in the purchase orders, for example, Defendant's Exhibit 6. As far back as 1986, it was understood that CFP needed to keep whatever inventory was necessary to assure Potlatch of a continuity of supply. Moreover, this practice between the parties confirms the fact that so-called "blanket purchase orders" did not reflect the practice and behavior of the parties on a year-to-year basis in many respects. Rather, the purchase orders, irrespective of where they emanated from, were primarily used for billing purposes, record-keeping purposes and, at times, to confirm a modification of the oral agreement between the parties. To suggest otherwise is contrary to the evidence.

9. Potlatch required specially-manufactured products from CFP. The lumber required by Potlatch was unusual in width. A standard board width finishes to 1/2". The lumber required by Potlatch needed to finish to 1/8". For example, a standard board, 5/4" x 6" would finish to 1 1/6" thick by 5 1/2" wide. For CFP to meet Potlatch requirements, that same board would have to finish to 1" by 5 1/8". For CFP to make the board usable on the open market, it would have to be taken back to a 4/4" by 4" board which means it would finish to 3/4" by 3 1/2".

10. From the outset of the relationship between Potlatch and CFP, Potlatch made it clear to CFP that "we must never run out of inventory, or everything stops." According to Jack Munter, Potlatch viewed CFP as an extension of Potlatch, to the extent that Potlatch was well aware that Potlatch was the only significant customer of CFP. In fact, CFP acknowledges that Potlatch accounted for 90-95% of CFP's business.

11. A variety of representatives for both parties acknowledge that over the years a number of oral discussions concerning inventory occurred. Various characterizations have been attributed to these discussions.

The oral discussions included verbal agreements and promises from both sides that occurred early in the relationship between representatives of Potlatch and CFP founder, Carl Christensen. The evidence establishes that when the parties started doing business with one another, Potlatch agreed that if it ever ceased doing business with CFP, it would purchase all of the Potlatch-designated inventory kept by CFP. Or, to use the phrase that came up time and time again at trial, Potlatch promised CFP that it would not leave CFP "hanging" with lumber produced to meet Potlatch's unique requirements. Jerry Digiovanni testified that he made a specific inquiry in order to receive verification from every new person with authority at Potlatch

that Potlatch would buy CFP's inventory if they ever made changes to the sizes or ceased doing business with CFP. That is precisely what happened in 1997 when Potlatch stopped using 7/8" board and began using 5/4" board at the Cloquet plant. At that time, Potlatch purchased all of CFP's 7/8" inventory, both finished and rough lumber, as noted in paragraph 8.

12. Jerry Digiovanni met with Dave Dinham and Elmer Walls, the Potlatch persons in authority, when Jerry Digiovanni first purchased CFP. Jerry Digiovanni also met with Thomas Ebinger, Rod Petron, and Richard Erdmann as they came into authority at Potlatch.

The Court finds credible Jerry Digiovanni's testimony that he confirmed this term of their oral contract or, alternatively, the promise that Jack Munter and others made to CFP, to "not leave CFP 'hanging'" with respect to the inventory. More significantly, the testimony of Jerry Digiovanni is consistent with the relationship of the parties, as established by the evidence and the custom and practice of Potlatch and CFP, up until the relationship was terminated.

In the words of Jack Munter during the trial, "If I would have been there, this would not have happened." It is clear from the evidence that there could not have been a continuity of supply, as Potlatch required, without a commercially reasonable amount of inventory.

13. Potlatch knew from the very beginning that there had to be a substantial inventory, quite separate from the issue of whether it was air-dried or kiln-dried, in order to provide this continuity of supply and to often provide it with less than 24-hours notice. That was part of their agreement. Significantly, most employees and representatives of both parties were clueless when it came to whether the specially-manufactured wood in question was kiln-dried, air-dried, or a combination of both. This demonstrates that the essence of the parties' relationship was the oral agreement and not the purchase orders and acknowledgment forms that merely mirrored how the

parties conducted business on a day-to-day basis. For example, in a number of the so-called blanket orders and individual orders, the initials "K.D." were used to identify "kiln-dried" wood. However, no one was quite sure if the wood was being kiln-dried and, in fact, none of the wood was actually kiln-dried. The presence of "K.D." or "kiln-dried" on the orders is consistent with Christensen's position and the evidence in the case that many form purchase orders and acknowledgment forms were generated where no meeting of the minds occurred with respect to the language.

The same can be said about the 90-day provision that appears on one of the purchase orders, stating: "Potlatch will purchase up to three-months' usage, per attached list of Christensen's committed inventory for Cloquet following notice of discontinuance of any base stock item." The evidence clearly establishes that a 90-day inventory was never negotiated between the parties, the 90-day inventory would not result in a continuity of supply to Potlatch, and there is no explanation by any representative from Potlatch as to how that 90 days was arrived at and where it came from.

14. Jack Munter acted as purchasing manager for Potlatch from 1996-1997. Both parties agree that Jack Munter held a face-to-face meeting with Jerry Digiovanni in Brainerd in the fall of 1997, just prior to his retirement. Jerry Digiovanni raised the issue of purchase of inventory at that meeting. While it is true that, based upon the evidence before the Court, Jack Munter did not commit Potlatch to purchase a specified amount of inventory, it is also true that the agreement of the parties was that Potlatch was responsible for what was a commercially-reasonable amount of inventory needed to fulfill the contract and to maintain the continuity of supply.

15. Jerry Digiovanni never advised Jack Munter of a specific quantity of inventory maintained by CFP. Neither Jack Munter nor anyone else prior to that time ever requested such an inventory. This is consistent with the oral agreement and the relationship of trust between the parties. The parties understood that the Plaintiff would maintain whatever inventory was reasonably necessary to comply with and maintain the continuity of supply. This agreement worked for nearly 20 years.

16. Essentially, everything changed in 1999 when Richard Erdmann became Potlatch's purchasing agent. Given the market conditions at that time, Potlatch was becoming increasingly concerned about costs, which in turn led to a re-evaluation of all of Potlatch's contracts, including the contract with CFP.

17. In the fall of 2000, Richard Erdmann decided to put the contract out for competitive bids that involved CFP.

18. On November 2, 2000, a Request for Proposal ("RFP") was mailed out to three prospective lumber suppliers requesting bids to supply pallet and skid lumber materials for the upcoming year (2001).

19. The RFP was mailed out to CFP, Weekes Lumber, and Savanna Pallet. Bids were received from all three companies.[1] Potlatch compared the bids and awarded the contract that CFP had enjoyed for nearly 20 years to Savanna Pallet, the low bidder.

---

[1] The Court will not address the propriety of the bidding process, as it is not relevant to the Court's decision in this case.

20. On December 14, 2000, Richard Erdmann, on behalf of Potlatch, notified CFP by letter (Plaintiff's Exhibit 47) that Potlatch would be changing vendors and that the supply contract for the succeeding year would be awarded to Savanna Pallet.

In that same letter, Richard Erdmann acknowledged the oral agreement in place to buy what the letter referred to as "on-hand stock." The letter from Richard Erdmann stated as follows:

> Thank you for your proposal to meet Potlatch's pallet wood requirements for the up-coming year. The purpose of this letter is to notify all potential suppliers that we have evaluated all proposals and have made our decision. Your organization was not selected to be our primary supplier for the up-coming year. *I do request that we be immediately notified of what on-hand stock wood is in your yard that you have designated as specific hold for Potlatch. I understand that a verbal agreement between yourself and former Potlatch employees was made to ensure you are made whole for the stocks that you have maintained. Once we know the specific quantities a determination of release shipments will be made.*

(Emphasis added.)

21. On December 15, 2000, Jerry Digiovanni faxed a letter to Richard Erdmann expressing disappointment at having been replaced as vendor. (Plaintiff's Exhibit 48.) The letter also detailed CFP's inventory. This letter was the first statement or writing Potlatch had ever received specifying the total amount of inventory CFP maintained. The inventory specified in the letter amounted to approximately 3.9 million board feet. This represented approximately a 13-month supply, based on Potlatch's prior usage patterns.

22. At Richard Erdmann's direction, Ron Petron and Rick Engholm visited CFP for the first time on January 15, 2001, and viewed the inventory of CFP. Thereafter, Potlatch continued to buy product from CFP until approximately the end of April 2001. This was approximately four months after Potlatch sent a notice of termination to CFP.

23. Potlatch purchased a total of $478,226.41 of product from CFP during the period from January 1 to April 30, 2001.

24. Incredibly, CFP did not ask Potlatch between December and April if it should keep maintaining its inventory. Equally incredible is the fact that Potlatch did not tell CFP that it did not want CFP's inventory, or that CFP should stop producing inventory because CFP was no longer a major supplier to Potlatch.

Both parties were silent, to their own detriment. Moreover, prior to the notice of termination of the contract on December 14, 2000, no one from Potlatch suggested that it would not be commercially reasonable for CFP to maintain their same inventory because of market conditions. CFP had no obligation to reduce their inventory, based upon the business climate, prior to December 2000.

25. The Court finds and concludes that at the end of December 2000, CFP had an inventory of 3.9 million board feet.

26. Based upon the purchase history established by the evidence between Potlatch and CFP, Potlatch purchased an average of 282,204 board feet of lumber per month from CFP during 2000 (3,386,454 board feet ÷ 12 months), for which Potlatch paid CFP $1,589,893.88 (representing a monthly average of $132,500 per month). Based upon the average usage figures for the year 2000, Potlatch was paying CFP an average of $470 per thousand board feet ($132,500 ÷ 282,204 board feet per month) for the various components being purchased for use in the construction of pallets and skids. The rough-cut lumber inventory that was not sold to Potlatch had not yet been planed. Therefore, CFP did not incur those costs of production ($58 per thousand). Also, CFP did not have to incur the cost of delivery ($15 per thousand).

27. CFP's costs for producing the rough-cut lumber pallets and skid components, for purposes of determining damages, was approximately $396.48 per thousand board feet, or $73 per thousand less than if CFP had finished the lumber to specification and then sold it to Potlatch at the existing contract price.

28. The Court finds the value of 3.9 million board feet, based upon the figures set forth above, as of the end of December 2000, to be as follows: 3.9 million board feet ÷ 282,204 = 13.819789 months. When that figure is multiplied by $111,888.24, the total value of the inventory in December 2000 was $1,546,271.80. Between December and April 2001, Potlatch purchased $478,226.41 worth of lumber. When that number is subtracted from $1,546,207.80, the resulting figure is $1,068,045.40. Just prior to trial, CFP identified a buyer for the total rough-cut lumber remaining on site for $625,000. When that figure is subtracted from $1,068,045.40, the resulting figure is $443,045.40.

29. The Court finds that CFP's 3.9 million board feet of inventory in December 2000 was commercially reasonable. Moreover, 3.9 million board feet of inventory was reasonably necessary, based upon the evidence before the Court, to provide a continuous supply of wood to Potlatch, based upon their requirements, pursuant to the agreement between the parties.

30. CFP borrowed $450,000 in April of 2000. Potlatch did not stop buying their customary allotments of wood products from CFP until the end of April 2001, approximately one year later. There exists insufficient evidence before the Court to establish an actionable nexus between the breach of the contract by Potlatch and the loan of $450,000 in April of 2000.

31. Christensen has alleged $155,000 as reasonable storage fees of the Potlatch-designated inventory on 22 acres of land for 31 months. The Court finds and concludes

that Christensen has not established any out-of-pocket expenses for any claimed storage fees or rent and therefore has established no damage with respect to their claim for storage costs.

32. The Court finds that Christensen has failed to establish any additional damages for lost investment income based upon the record before the Court. That issue is speculative at best.

33. That any Conclusion of Law which is deemed a Finding of Fact is incorporated herein as such.

Based upon the above Findings of Fact, the Court now makes its:

**CONCLUSIONS OF LAW**

1. A valid, enforceable oral contract existed between CFP and Potlatch pursuant to Minn. Stat. § 336.2-21(3)(1)(a) because the wood products produced by CFP were specifically manufactured goods for Potlatch. The wood in question was not suitable for sale to others without a substantial loss to CFP in the ordinary course of CFP's business. Lumber produced by CFP for Potlatch was specialized and unique in its dimensions. Further, one of the terms of the valid, enforceable, oral contract that existed between CFP and Potlatch was that Potlatch would agree upon termination of the agreement to purchase any inventory that CFP had, so long as it was a commercially reasonable amount of inventory.

2. Consistent with the findings of fact, 3.9 million board feet of specialized wood products produced by CFP for Potlatch was a commercially reasonable amount of inventory in December 2000.

3. Consistent with the findings of fact, and because the Court has found that the purchase orders and acknowledgment forms did not represent the agreement between the parties,

there was necessarily no modification by any subsequent oral agreement between the parties because the contract between the parties was oral.

4. The Court finds and concludes that CFP appropriately mitigated their damages; however, the Court finds that Christensen has failed to prove that they are entitled to any additional damages by reason of additional sales that were made in which they reportedly lost $117,451 on the sale of lumber to Woodland Container and $23,628 on the sale of lumber to Dwire Stake & Lathe.

5. Alternatively, the Court finds that in the event that the term of the oral agreement of the parties with respect to Potlatch purchasing CFP's remaining inventory is for some reason deemed indefinite or vague, the evidence establishes that, from the very beginning, a variety of representatives for Potlatch made a clear and definite promise to CFP that Potlatch would purchase CFP's inventory. Implicit in this promise, of course, was that the amount of the inventory would necessarily have to be a commercially reasonable amount, based upon the agreement of the parties. Therefore, the result in the case is the same under both theories.

The Court has found a contract, and, without relying on the theory of promissory estoppel, the evidence establishes that consistent with the specific terms of the oral agreement of the parties and consistent with the custom and practice of the parties over nearly 20 years, the clear understanding of the parties was that Potlatch would purchase the inventory from CFP upon termination of the agreement, and every purchasing agent for Potlatch up until Richard Erdmann consistently confirmed this agreement.

6. CFP is entitled to damages from Potlatch in the amount of $443,045.40, plus costs and disbursements.

7. Any Finding of Fact which is deemed a Conclusion of Law is incorporated herein as such.

8. The attached memorandum is made a part hereof.

Based upon the above Findings of Fact and Conclusions of Law, this Court enters the following:

**ORDER FOR JUDGMENT**

1. Judgment in favor of Plaintiff Christensen Forest Products, Inc., and against Potlatch Corporation be entered in the amount of $443,045.40, plus costs and disbursements.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January 21, 2004

DONOVAN W. FRANK
Judge of United States District Court

**MEMORANDUM**

Simply stated, it still amazes the Court that with the full knowledge of Plaintiff and Defendant, millions of board feet of usable lumber that was especially cut for Potlatch have laid on the ground for a number of years. Each party can assert why that has happened but, irrespective of the reasons, the result is detrimental to both parties and certainly contrary to the best interests of their respective companies.

The parties had a stable contractual relationship based upon an oral agreement made nearly 20 years ago when CFP began supplying Potlatch Corporation with precut lumber. The various terms set forth in individual written purchase orders, including the blanket orders,

sometimes confirmed the verbal agreement of the parties and sometimes contradicted or were otherwise inconsistent with how CFP and Potlatch conducted their daily affairs with one another. Various terms in these purchase orders, including, but not limited to the 90-day provision for inventory and much of the fine print, including the merger provisions, were never discussed or negotiated and were entirely contrary to the custom and practice of the parties and the verbal agreement between the parties, apart from the responsibility of Potlatch for a quantity of the inventory.

The parties had a verbal agreement, made with a handshake, that seemed to work almost flawlessly until a change in personnel occurred after the retirement of Jack Munter.

There is no doubt, based upon the evidence before the Court, that the parties specifically agreed that Potlatch would be responsible for a commercially reasonable amount of inventory. That term makes perfect sense to the Court, because a significant amount of inventory was necessarily required to maintain the continuity of supply that was required by the agreement. The agreement was not perfect, but it worked.

Both parties must share some responsibility for never discussing such issues as kiln-dried wood versus air-dried wood. However, regardless of what they discussed, the agreement worked, even though if one were to blindly follow the form purchase orders that neither party negotiated or ever discussed, one would necessarily conclude that all the wood was kiln-dried and that the parties had negotiated at the outset a contract term that required Potlatch to be responsible for only 90 days of CFP's inventory. The parties never contemplated that Potlatch would only be responsible for 90 days of CFP's inventory. Undisputably, if CFP would have only kept 90 days of inventory, they could not have possibly performed one of the most essential terms of that

agreement, namely, continuity of supply of wood to Potlatch, often on very short notice. There was essentially no testimony from any party as to where the 90-day term may have arisen from. There was no such testimony because the contract would have been immediately breached by CFP if CFP was only responsible for generating a 90-day inventory. On the record before the Court, a 90-day inventory, at any time during the year, would not have provided continuity of supply to Potlatch. This continuity of supply is, in fact, what Potlatch bargained for. Moreover, the Defendant's own expert, John Rajala, readily acknowledged that a 90-day supply of product would not sustain a continuous supply of lumber to Potlatch.

The parties had a valid oral contract that served the business interests of both parties well for nearly 20 years. For a variety of reasons, the agreement that worked so well for nearly 20 years came to an end in 1999, at a time when market conditions were in a state of flux and when Richard Erdman became Potlatch's purchasing agent. However, a 90-day supply of inventory did not create continuity of supply a decade earlier and it did not create continuity of supply in 1999. From the very beginning, CFP kept a substantial inventory that was commercially reasonable, given the terms of the agreement and the requirements of Potlatch. To suggest otherwise would not only be contrary to the agreement, but, in all respects, contrary to the custom and practice between the parties. The 90-day inventory assertion by Potlatch is simply contrary to the evidence in the case, regardless of what a document here and there might seemingly suggest when taken out of context.

Approximately 4 million board feet of specialized wood products produced by CFP for Potlatch had been a commercially reasonable amount of inventory for nearly 20 years. It was a commercially reasonable amount of inventory in December 2000 as well. Frankly, it appears to

the Court that someone at Potlatch agreed to use the inventory and then someone else made a different decision and, ignoring the parties' relationship, asserted an inexplicable 90-day limit on the inventory. Undoubtedly, such an inventory would not have provided continuity of supply to Potlatch.

The time has long since passed when the parties could perform their responsibilities under the agreement they enjoyed for nearly 20 years and, in so doing, bring this expensive, and, in many ways unnecessary, litigation to a close. CFP is entitled to $443,045.40, plus costs and disbursements, assuming that they receive $625,000 for the sale of the rough-cut lumber remaining on their property.

**Conclusion**

Based upon the Court's evaluation of the evidence in this case and the applicable law, the Court concludes that its findings and conclusions are consistent with the evidence and the law. The Court would respectfully request that the parties utilize their best efforts to once and for all bring this matter to a close.

D.W.F.

# UNITED STATES DISTRICT COURT
## District of Minnesota

700 Federal Building
316 North Robert Street
St. Paul, MN 55101

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

417 Federal Building
515 West First Street
Duluth, MN 55802

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*